IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC WYATT | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 20-4969 |
| ELIZABETH SMITH, ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                              **NOVEMBER 23, 2020**

Plaintiff Eric Wyatt entrusted $114,000 of his money to his girlfriend, Defendant Elizabeth Smith, for safekeeping. The money was kept in a savings account set up in her name. Wyatt had received the money after settling a personal injury class action lawsuit in which he was a plaintiff. After their relationship ended, Smith changed the password on the account, transferred the money into a new account with Defendant OceanFirst Bank, and began spending Wyatt's money. Wyatt brings a claim against Smith for tortious conversion. He also requests OceanFirst Bank to set up a constructive trust to hold his funds. To prevent further depletion of his money, Wyatt sought and obtained a temporary restraining order, which effectively froze Smith's OceanFirst bank account pending a hearing on preliminary injunctive relief. We subsequently held a hearing on Wyatt's request for a preliminary injunction.[1] This Memorandum sets forth the Court's reasoning for granting the preliminary injunction at that hearing.

---

[1] Wyatt testified at the hearing. (ECF Nos. 8, 9.) Approximately 50 exhibits were received into evidence. (Pl.'s Exs. (on file with Court).) Despite being notified, Smith failed to appear for the hearing.

**I.      FINDINGS OF FACT**

Wyatt suffered significant injuries from an automobile accident in 2015.  (Hr'g Tr. 9-10, ECF No. 9; Pl.'s Exs 1-9.)  After the accident, Wyatt participated in class action litigation involving the failure of General Motors vehicles to deploy airbags.  (Hr'g Tr. 11; Pl.'s Exs. 9-12.)  The class action ultimately settled and in December of 2019, Wyatt received a net settlement check in the amount of $138,069.61.  (Hr'g Tr. 11; Pl.'s Ex. 14.)  He initially deposited the settlement funds into his checking account with Discover Bank; however, he became frustrated by the limitations that the bank placed on withdrawing funds.  (Hr'g Tr. 12, 14; Pl.'s Ex. 80.)  He had just launched a new business venture making stuffed teddy bears and needed quick access to his funds to pay for start-up expenses.  (Hr'g Tr. 14-15.)

Wyatt's continued frustrations with Discover Bank led him to reconsider where he should keep his settlement funds.  (*Id*.)  At the time that he received the funds, Wyatt was living with his girlfriend, Smith, in Philadelphia.  (*Id*. at 13.)  Smith had an established checking account with Wells Fargo.  (*Id*.)  Wyatt and Smith agreed that Smith would open a savings account with Wells Fargo in her name so that Wyatt could transfer his settlement funds to that account.  (*Id*. at 14.)  On July 2, 2020, Wyatt transferred $114,495.63, which was the amount remaining of his settlement funds, into the Wells Fargo savings account that Smith set up for him.  (Hr'g Tr. 19; Pl.'s Exs. 56-58.)  Wyatt testified that the purpose of Smith opening an account was to "hold [his] funds in there, until [he] could establish everything, start [his] business, and get [his] own account."  (Hr'g Tr. 14.)  Wyatt did not intend that the settlement funds would be kept there indefinitely.  (*Id*.)  Nor did Wyatt owe Smith any money or intend to give her any money as a gift.  (*Id*.)

Even though Wyatt's settlement funds were placed in a savings account in his girlfriend's name, he still had access to and control over the money in the account. For example, Wyatt had a Wells Fargo mobile application on his phone and used Smith's username and password to access the funds in the savings account. (Hr'g Tr. 16.) Smith also provided Wyatt with a savings ATM card, which allowed Wyatt to withdraw money from the account at ATM machines or at Wells Fargo Bank branches. (*Id*.) Wyatt also maintained a stock-trading mobile application on his phone and linked his "stash account" on that application to the Wells Fargo savings account so that he could use his settlement funds to purchase stock. (*Id*.) Another example of Wyatt's control over the account occurred on June 12, 2020, when he transferred the balance of the funds—approximately $114,504.00 at that time—from Smith's savings account back into his Discover Bank checking account to gauge the ease at which he could transfer his money between the accounts. (Hr'g Tr. 28-29; Pl.'s Ex. 86.) Wyatt transferred the money back to Smith's Wells Fargo savings account a few days later. (*Id*.)

When Wyatt and Smith ended their relationship in mid-July, Smith transferred all of Wyatt's settlement funds to a separate account account to which Wyatt did not have access. Wyatt testified that their relationship started to "go south" in June or July of 2020. (Hr'g Tr. 27.) Wyatt had suspicions that Smith was stealing money from his wallet. (Hr'g Tr. 17.) On July 15, 2020, through text messages, Wyatt questioned Smith about missing cash and ultimately ended their relationship. (*Id*. at 17-18, 19.) Wyatt also told Smith over text message that he was going to transfer the remainder of his settlement funds out of the Wells Fargo savings account back to his Discover Bank account. (*Id*. at 18-29.) Within 24 hours of the breakup, Smith moved out of Wyatt's home, changed the password on the Wells Fargo account so that Wyatt could no longer access his settlement funds, withdrew $3,000 from the account, and then transferred the

remainder to her personal Wells Fargo checking account. (*Id*. at 17-18, 19-20; Pl.'s Exs. 47, 56-57.) Wyatt attempted to transfer his settlement funds to his Discover Bank account, but that transfer request was denied because the funds were no longer there. (Hr'g Tr. 28-29; Pl.'s Exs. 41.)

On July 16, the day after the breakup, Smith withdrew what was remaining of Wyatt's settlement funds, $111,789.23, from a Wells Fargo Bank branch store. (Hr'g Tr. 21-22; Pl.'s Ex. 53-54.) She eventually opened a new bank account with OceanFirst and deposited the money there. (Hr'g Tr. 26; Pl.'s Ex. 70.) Bank records reveal that Smith began to spend the money. Purchases included $178.96 at Walmart, $32.23 at Wawa, $33.43 to Shoprite, $149.04 to Sprint. (Hr'g Tr. 24; Ex. 42.) Smith also used the money to pay off the balances on three of her credit cards. (Hr'g Tr. 27-28.) She paid $535.80 towards her Platinum Mastercard, $377.63 toward her Credit One Bank Card, and $1105.20 toward her Sprint Home Credit credit card. (*Id*.; Pl.'s Exs 50, 68-71.) To stop Smith from spending more of his money, Wyatt lodged two criminal complaints. For some reason, law enforcement did not pursue criminal charges against Smith. (Hr'g Tr. 30.) As a result, Wyatt brought this civil suit.

On October 7, 2020, Wyatt filed a Complaint alleging tortious conversion against Smith and seeking a constructive trust to be set up by OceanFirst Bank. (ECF No. 1.)[2] The following day, he filed a motion for a temporary restraining order, requesting that the Court order OceanFirst to freeze all withdrawals from Smith's bank accounts. (ECF No. 2.) On October 9, 2020, an Order was entered granting Wyatt's request for a temporary restraining order. (ECF No. 3.) A hearing on Wyatt's request for a preliminary injunction was scheduled for October 15,

---

[2] We have jurisdiction over this case by way of diversity. 28 U.S.C. § 1332(a)(1). Wyatt is a resident of Pennsylvania and Smith is a resident of New Jersey. Smith moved to New Jersey in mid-July after the breakup with Wyatt. (Hr'g Tr. 25.)

4

2020.  The day prior to the hearing, the Court received a letter from counsel for OceanFirst, stating that Smith's account was frozen and that OceanFirst had no objection to the relief sought in Wyatt's Complaint, so long as it is not liable for damages.  (OceanFirst Oct. 4, 2020 Ltr. (on file with Court).)  OceanFirst also advised that when it froze Smith's bank account, it contained $52,104.69—less than half of the amount Wyatt initially transferred to Smith for safekeeping.  (*Id*.)  Smith was notified of the preliminary injunction hearing numerous times.  She failed to attend.

**II.      CONCLUSIONS OF LAW**

Preliminary injunctions are extraordinary remedies that are granted in limited circumstances.  *Ferring Pharm., Inc. v. Watson Pharm., Inc*., 765 F.3d 205, 210 (3d Cir. 2014).  To obtain a preliminary injunction, Wyatt must establish the following elements:  (1) that he is likely to succeed on the merits of his claims; (2) that he is likely to suffer irreparable harm without relief; (3) that granting the injunction does not result in greater harm to the defendants; and (4) that the relief sought is in the public interest.  *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017).  Wyatt established each of these elements.

**A.      Likelihood of Success on the Merits**

First, Wyatt is likely to succeed on the merits of his tortious conversion claim against Smith.  Under Pennsylvania law, conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification."  *Eisenhauer v. Clock Towers Assocs*., 582 A.2d 33, 36 (Pa. Super. Ct. 1990) (citations omitted).  "When such an act occurs, the plaintiff may bring suit if he or she had either actual or constructive possession, or an immediate right to possession of the chattel at the time of the conversion."  *Id*. (citations omitted); *see also* Restatement (Second) of Torts § 237 (1965)

("One in possession of a chattel as bailee or otherwise who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession, is subject to liability for its conversion."). There is no dispute that "[m]oney may be the subject of a conversion," but "only where the plaintiff had a property interest in the money at the time of the alleged conversion." *Kia v. Imaging Sciences Int'l, Inc.*, 735 F. Supp. 2d 256, 270 (E.D. Pa. 2010) (citations omitted).

The record demonstrates that Wyatt clearly had a property interest in the money. The money represented funds that he received after settling a personal injury class action lawsuit. Due to the limitations that he experienced in banking with Discover, where he had an account, Wyatt entrusted the funds to Smith, his live-in partner at the time, to protect the funds in a savings account she set up with Wells Fargo. Wyatt intended to transfer the funds to Smith's account only temporarily, until he could start his business and open a new bank account. He did not intend that the money would be kept in Smith's account indefinitely. It was understood that the money belonged to Wyatt and not to Smith. Wyatt did not intend to give Smith the money. Nor was he indebted to her.

The record also demonstrates that Smith "deprived" Wyatt of his right to his money, without his consent and without lawful justification. *Eisenhauer*, 582 A.2d at 36. The day that their relationship ended, Smith covertly transferred the funds from the Wells Fargo savings account to her personal checking account. When she did this, Wyatt lost access to and control over the funds. Wyatt did not authorize this transfer, and Smith did not have any right to the funds or to make the transfer. The money did not belong to her. Smith subsequently withdrew all of the funds from Wells Fargo and placed them into an account with OceanFirst Bank. She then began using the funds to make large purchases and pay off her credit card balances. The

evidence reflects that Smith has spent more than half of Wyatt's settlement proceeds. She essentially committed theft.

Finally, the record shows that Wyatt had actual or constructive possession of his money, or at the very least, had an immediate right to possession of it. Up until the time that Smith transferred the funds out of the Wells Fargo account, Wyatt had access to and control over his funds in that account. He could access the funds through the Wells Fargo mobile application on his phone or by using his ATM card. He also linked the account to a stock-trading application so that he could easily purchase stocks. Based upon the evidence and testimony, we are satisfied that Wyatt would likely succeed on the merits of his conversion claim against Smith.

### B.     Irreparable Harm

Second, Wyatt would suffer irreparable harm if we denied his request for a preliminary injunction. To demonstrate irreparable harm, Wyatt must show "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (citations omitted). "The preliminary injunction must be the only way of protecting the plaintiff from harm." *Id* (citations omitted). After Smith surreptitiously transferred Wyatt's money out of an account that he had access to, she began using the money to make large purchases and pay off her credit cards. In just four months, Smith has managed to squander more than half of Wyatt's settlement funds. There is no evidence in the record that Smith has any assets. A money judgment therefore would be meaningless to Wyatt. Without this injunction and the continued freeze on Smith's OceanFirst Bank account, Smith would continue to spend Wyatt's money until it was depleted.

7

### C.      Harm to Defendants and Public Interest

Wyatt has also established the third and fourth elements of a preliminary injunction. Granting a preliminary injunction will not result in greater harm to OceanFirst Bank. In fact, we perceive no harm that could result to OceanFirst Bank. Counsel for the Bank advised the Court that it does not object to the relief sought in the Complaint. A preliminary injunction will also not result in greater harm to Smith. Significantly, despite repeated notice, Smith willfully failed to appear for the hearing on this preliminary injunction. If Smith was experiencing detrimental effects from our entry of the TRO, one would think that she would have, at the very least, appeared at the hearing to explain the harm she was suffering. She did not appear for the hearing and has not responded to inquiries by Wyatt's counsel and by the Court. The only harm to Smith that we perceive is that her account with OceanFirst has been frozen. However, the record reveals that nearly all the money in that account can be traced to Wyatt's settlement proceeds. To the extent that Smith wants to manage her own money, she is free to open another bank account.

Finally, granting a preliminary injunction serves the public interest. "This factor requires the court to look beyond the parties' respective interests and to gauge the injunction's potential effects on the community as a whole." *McCahon v. Pennsylvania Tpk. Comm'n*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007). The public has an interest in preventing theft and ensuring that there are remedies for victims of tortious conversion. To put it simply, the public has an interest in seeing justice prevail.

**III.     CONCLUSION**

For the foregoing reasons, Plaintiff's request for a preliminary injunction is granted.  An appropriate order follows.

                                                **BY THE COURT:**

                                                **/s/ *R. Barclay Surrick***
                                                **R. BARCLAY SURRICK, J.**